Filed 7/11/14  In re A.H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re A. H., a Person Coming Under the Juvenile Court Law. | D065333 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. No. EJ3742) |
| v. | |
| J. H., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Carolyn Caietti, Judge.  Affirmed.

Christina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Maria Diaz, under appointment by the Court of Appeal, for Minor.

In this appeal from dependency orders, J.H. (Mother) challenges the sufficiency of the evidence to support the trial court's jurisdictional and dispositional orders which resulted in the removal of her infant daughter, A.H. (Baby), from her custody. We reject her contentions of error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother, age 25 at the time of Baby's birth, has a developmental delay and has been a client of San Diego Regional Center (Regional Center) since age two. Mother has also been diagnosed with depression, bipolar disorder, and anxiety; has had multiple psychiatric admissions; is under the care of a psychiatrist; and has been prescribed antidepressant and antipsychotic medications. Mother lives with her mother (Grandmother), who is also believed to have a mild developmental delay. When seen by medical health professionals in preparation for Baby's birth, Mother was characterized as having "fairly good functional status as she is able to prepare her own meals and do her own activities of daily living."

Baby was born in the summer of 2013. While Mother was still at the hospital after Baby's birth, staff reported Mother was bonding with Baby, did well when Baby was put in her arms, and followed directions. However, Mother was a slow learner, frequently called the nurse, and was not aware when Baby was sucking on her nipple. The staff was concerned Mother might be unable to care for Baby on her own and she was not responsive to Baby's cues for feeding; accordingly, the hospital made a referral to the Health and Human Services Agency (Agency). The Agency investigated the matter and received information regarding the plans for Mother to receive assistance from

2

Grandmother and the Independent Living Services (ILS) program. The Agency determined the referral allegation was unfounded, with the understanding the hospital social worker would notify the Agency if any further concerns arose.

While Mother and Baby were living at home with Grandmother, Mother received various services to help her and Baby, including regular visits and assistance from ILS workers and public health nurses.[1] About two and one-half months after Baby's birth, on October 25, 2013, the Agency received a referral alleging Mother was neglecting Baby. A concern had developed about Baby's slow weight gain and Mother's care of Baby. Baby had a low birth weight (five pounds, six ounces); in October she weighed eight pounds, nine ounces; and she was in the second percentile for weight gain. According to the referral, Mother struggled to wake up at night to feed Baby and was not following instructions for using sterile bottles.

During a two-hour investigative visit to the residence on October 25, Agency workers observed Baby and interviewed Mother, Grandmother, and Mother's ILS worker. The Agency workers saw that Baby appeared to be "small and of little weight"; she had a dirty neck and fingernails and a flat affect; and she was lethargic and did not cry or coo. When an Agency worker held Baby, she appeared to be "staring out in space" and did not respond to the worker's attempts to engage her. During the visit Mother made no effort to interact with Baby and did not respond when Baby was fussing.

---

[1] An Agency report states Mother was receiving about 40 hours per week of ILS services and weekly visits from a college nursing student. Another document in the record states Mother had an ILS worker assisting her three days per week.

Grandmother was adamant that Baby was fine, and said she and Mother fed Baby, and Mother got up at night to feed Baby and did not miss a feeding. Grandmother worked three-hour shifts three days a week; she helped take care of her own mother and two other people; and when Grandmother was at work Mother was alone with Baby. Mother said she fed Baby every two hours, including at night, and she gave her two or four ounces of formula. At one point Mother said to the worker that she sometimes did not " 'like to get up' " but when asked to explain, Mother became nervous and did not elaborate.

When the Agency observed Mother making and giving Baby a bottle, Mother appeared flustered and agitated, used a bottle that appeared to have milk residue, and did not appear to be bonded to Baby or interested in holding her. Mother did not initially notice when milk was coming out of Baby's mouth and dribbling down her chin and neck at a steady pace; after a few minutes when Mother did notice, she panicked and did not know what to do. After a few more minutes Mother cleaned Baby with a blanket and burped Baby over Mother's shoulder, and while doing so Mother "had a look of disgust on her face." When Mother returned to feeding Baby, Mother did not interact with Baby and appeared to be agitated. Baby drank about 2.5 ounces of formula.

Mother's ILS worker reported to the Agency that she had concerns about Mother not feeding Baby properly, especially when Grandmother was at work. Mother had told the ILS worker that sometimes she does not feed Baby because she is too tired, and she is not going to wake up in the middle of the night to feed Baby because she is tired. The ILS worker said if Baby does not take the bottle right away Mother will not continue

4

trying, and the visiting nurses have to give Mother the same information every time they visit and have to "force" Mother to make the bottle and feed and hold Baby. On one occasion when the ILS worker was going to take Mother and Baby to an appointment, Mother panicked, put Baby down on the floor in her car seat, and ran away. The ILS worker did not think Grandmother could take care of Baby full time because Grandmother had to help her own mother.

During the visit on October 25 when an Agency worker told Mother it was important to go to the hospital to get Baby checked, Mother became extremely agitated and started screaming, saying " 'No! I stink my face.' " When the worker asked Mother what she was worried about, Mother yelled, " 'I'm going to fucking kill you. I don't want to go, not with my face like this.' " Mother continued to yell and threaten the worker, was unable to calm down, and was "clawing at the walls." The police were summoned. While waiting outside, the worker heard what appeared to be objects being thrown and heard Mother screaming and yelling, " 'I'm not stupid' "; " 'I can't go with this face, stop telling me to calm down.' " The ILS worker told the Agency workers that Grandmother had described this behavior before, but it was the first time the ILS worker had seen it firsthand. When the Agency worker reentered the home with the police, Mother had locked herself in a room. Grandmother said Mother was experiencing rapid heartbeat and could not breathe, and Grandmother pointed at the worker and yelled, " 'She did this. This is all her fault.' "

At the conclusion of the visit on October 25, Baby was removed from Mother's home and detained in a foster home. On October 28, Baby was examined by Dr. Jennifer

5

Davis at a failure-to-thrive clinic. The foster mother told Dr. Davis that Baby had a flattened head, seemed " 'floppier' " than most babies, and did not cry to show hunger. The foster mother said baby ate four ounces of formula every three hours; it took her about 45 minutes to finish a bottle; and she initially had a "good suck" but then lost interest and fell asleep. Dr. Davis observed that Baby had a small head and "some facial abnormalities," including a "slightly dysmorphic appearance with triangular facies with narrow chin." (Boldface type omitted.) After receiving information from the foster mother and an Agency worker, Dr. Davis diagnosed Baby with failure to thrive and assessed: "Comprehensive evaluation reveals that infant has most likely not been fed adequately, but she may also have an underlying disorder. [Her] microcephaly [small head] is not well-explained by [failure to thrive], and given her family history of multiple members with delay combined with her slightly dysmorphic features and decreased tone, I am concerned about an underlying genetic condition. However, there is evidence that this infant is not ideally nourished based on her thin appearance with minimal subcutaneous fat." Dr. Davis made a recommendation concerning the amount of formula Baby should drink for "catch up growth," and stated Baby may need to be admitted to the hospital if the feeding went poorly. Dr. Davis also referred Baby for a cardiologic evaluation for a heart murmur and a genetic evaluation to address the issue of developmental delay, and stated Baby would benefit from a developmental services evaluation and may need an occupational therapy referral.

In the dependency petition filed on October 29, 2013, the Agency alleged that due to Mother's mental illness, including developmental delays, Mother was incapable of

providing regular care for Baby as indicated by Mother's inability to recognize when Baby needs feeding, her uncertainty on how much Baby should eat, her agitation when tending to Baby, and her disinterest in holding her, which had caused Baby to be underweight and which showed Baby had suffered or was at substantial risk of suffering serious physical harm. Based on communications from Dr. Davis, the Agency reported that although Baby was " 'not starving' " she was not feeding enough; she had "poor feeding" in that she "will initially suck and then stop"; and if she did not gain weight in seven to 10 days she should be admitted to the hospital. Also, the Agency noted Dr. Davis's observations concerning Baby's abnormal face; the possibility of a genetic component or organic condition that could be affecting Baby's ability to feed and the need to investigate this further; and the need for more information about Mother's and Grandmother's developmental delays. The Agency stated it was concerned that if Baby remained in Mother's care she would not receive the proper amount of food; it was also concerned about Baby's safety because of Mother's inability to regulate her reaction to stress; the support services already being provided to Mother had not been effective in preventing or eliminating the need for removal; Mother did not appear to have a good support system to ensure Baby's safety; there was a concern Mother would not follow through with the recommendations for genetic testing; and the hope was that with Agency assistance Mother could gain support, stabilize her mental health, and provide a safe environment for Baby.

At the detention hearing on October 30, 2013, the court ordered that Baby be detained and reunification services and liberal supervised visitation be provided to

7

Mother.  That same date Baby was placed in a foster home designated as a medically fragile home.

The foster mother for the medically fragile placement (who is a nurse) reported Baby did not cry for two days; she did not smile, coo, reach for toys, or track across the midline; and she acted like a six-week-old infant rather than a three-month-old.  The back of Baby's head was flattened; she was very thin and showed little affect; she had a weak suck reflex and "low tone" muscles; it was difficult for her to move her left arm; and she would lie on her back "with her extremities laid flat" and made little attempt to move.  Medical personnel determined she did not have fat tissue to keep her sufficiently warm; there were pits under her arms due to atrophy; and she may have infantile depression.

During the first week in the medically fragile foster home, Baby did not cry to indicate hunger at all.  As of November 12, 2013, she was just beginning to cry at times to show hunger.  The foster mother had to use her fingers to provide chin and cheek support during feedings.  During a feeding by the foster mother observed by the Agency social worker, Baby drank about two ounces of formula before she stopped sucking; the foster mother then burped her and allowed her to rest for about five minutes; and the foster mother then tried again with the last two ounces.  The process took about 30 minutes and the foster mother repeated it every three hours.  The Agency social worker noted that Baby was unable to do many of the things expected for her age, including lifting her head.  Although Baby was able to wrap her hand around the worker's finger, there was no strength to her grasp.  The worker saw that Baby was now able to make eye

8

contact and was beginning to coo and smile, and she was just beginning to be able to track an object with her eyes.

Pending the jurisdictional and dispositional hearing scheduled for December 2013, the foster mother arranged for Baby's various medical appointments and evaluations, including cardiology, radiology, ultrasound, and occupational and physical therapy. The foster mother stated Baby's caregiver would need to follow up on all the recommended services for Baby, including occupational and physical therapy, a cardiac ultrasound to confirm her heart murmur was benign, and visits to medical professionals to evaluate her weight. Also, Baby's caregiver would need to have a commitment to follow through with the recommendations for feeding techniques and physical therapy exercises. On December 4, 2013, the Agency requested that the foster mother be appointed as the child's educational representative because Baby needed immediate therapy and services since she was "severely at risk of cerebral palsy, has atrophy of her arm muscles from being left in one position for so long and has been diagnosed with infantile depression."

On November 12, 2013, Baby weighed nine pounds, two ounces, and on December 5 she weighed 10 pounds, 12.8 ounces. On December 12, 2013, the foster mother reported that Baby was now smiling, cooing and responding. Feeding continued to be difficult but was improving. Baby's "color ha[d] improved but her left hand [was] still blue sometimes." Medical evaluators recommended that Baby receive physical and occupational therapy twice per week, and a possible MRI in three months depending on her progress. The Agency assessed Baby "continued to have difficulty gaining weight,

9

feeding, and developing muscle tone, although she is making small steps toward success."

When interviewed by the Agency on November 12, 2013, Mother claimed she was feeding Baby enough and the information in the detention report was untrue, but she understood that to have her daughter returned she needed " 'to feed her so she grows.' " Supervised visitation with Mother occurred in November and arrangements were made for continued visitation.

In its jurisdictional and dispositional reports submitted to the court, the Agency recommended that Baby remain in the foster home, Mother be offered reunification services and supervised visitation, and Mother be ordered to submit to a psychological evaluation. The Agency assessed Mother "was able to follow directions with a service provider present, but it appears when they [are] not present, [Mother] struggled [to] feed the baby, especially during the night." Further, Baby "needs tremendous physical support and patience for feedings which so far the mother has not shown she is able to provide." The Agency explained that because of Baby's weak suck reflex, it takes considerable focus and assistance for her to take in the amount of formula needed for her to grow and develop. Her caregiver needs "to be able to pick up on subtle cues and show strict commitment to providing her basic needs as she is able to take them."

The Agency stated that because of Mother's developmental delays and mental health issues, there was a concern Mother would not feed Baby enough, and Baby would continue to gain weight slowly or not at all which would affect her ability to develop her muscles and brain. Further, there was a concern Mother would not interact with Baby

10

and Baby would learn "not to cue her caregivers for her needs." The Agency noted Mother defers to Grandmother, and Grandmother was not taking it upon herself to feed Baby during the night even though Grandmother was aware Mother was not waking to feed Baby. The Agency opined: "Although it appears [Baby] may have a biological reason for a poor sucking reflex, it also appears the mother failed to wake during the night to feed [Baby]. [Baby's] failure to cry when hungry, the flatness of the back of her head, and her flat affect in response to others, indicate it is highly likely the basic needs of this child were not being met. Although the mother appears to have good intentions towards her daughter, the developmental delays, mental health history, and the mother's inability to control her anger especially in relation to correcting her behavior inhibits the mother from providing for [Baby's] basic needs."

The Agency stated Mother needed to participate in a psychological evaluation to determine if she would benefit from services; she needed to participate in a parenting education program with assistance from the Regional Center to ensure the information is presented in a way she can understand; and her mental health symptoms needed to be addressed with her psychiatrist. The Agency stated it would be working closely with the Regional Center to ensure Mother is receiving services appropriate to her level of functioning. In the case plan, the Agency set forth the goals Mother was to reach (including feeding Baby consistently, taking Baby to her medical and developmental appointments, interacting with Baby to ensure Baby's development, and controlling Mother's anger) and specified the steps for Mother to achieve these goals, including the development of a safety network.

11

At a hearing on December 12, 2013, the court ruled there was clear and convincing evidence to support a jurisdictional finding under Welfare and Institutions Code section 300, subdivision (b), as alleged by the Agency.[2]  In its dispositional order that same date, the court ruled it was appropriate to remove Baby from Mother's custody under section 361, subdivision (c)(1).  In support, the court cited its clear and convincing evidence finding on the Agency's allegations in the dependency petition.  Further, the court ordered that Mother be provided reunification services and supervised visits and submit to a psychological evaluation.  The court also ordered that educational rights be assigned to the foster mother so Baby could receive the services she needed for her "acute medical needs" and failure to thrive.

## DISCUSSION

Mother asserts there is insufficient evidence to support the court's jurisdictional order because the evidence showed it was likely Baby's failure to thrive was caused by a genetic condition rather than neglect arising from Mother's developmental delay.  Additionally, she contends the record does not support the dispositional ruling to remove Baby from her custody, and the court should have instead returned Baby to her with provision of additional services.

When reviewing a challenge to the sufficiency of the evidence, we review the court's rulings for substantial evidence, resolving all conflicts and drawing all reasonable inferences in favor of the court's order.  (*In re Christopher R*. (2014) 225 Cal.App.4th

___

[2]      Subsequent unspecified statutory references are to the Welfare and Institutions Code.

12

1210, 1216 & fn. 4.) " '[A]ll conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact.' " (*In re E.B.* (2010) 184 Cal.App.4th 568, 575.) If the circumstances reasonably support the court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1446.)

I. *Challenge to Sufficiency of Evidence for Jurisdictional Finding*

A jurisdictional order is proper when the court finds by a preponderance of the evidence that the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the . . . inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b); *In re Christopher R., supra*, 225 Cal.App.4th at pp. 1215-1216 & fn. 4.)

The record supports the court's finding that Baby had suffered or was at risk of suffering serious harm due to Mother's inability to care for her. Even assuming Baby has a genetic condition that is causing or contributing to her feeding difficulties and other problems, the trial court could reasonably conclude Mother's developmental delays caused Mother to be unable to recognize and respond to the problems in a manner that ensured Baby would be able to grow and develop in a safe manner. When the Agency received the second referral and conducted its investigation, Baby was in a precarious state: she was very small and underweight; the back of her head was flattened; she had a flat affect and did not cry or coo; she did not respond to attempts to engage her; her armpits showed signs of atrophy and she made little attempt to move; and she was

13

suffering from possible infantile depression. Also, possibly because of a genetic condition, Baby had a poor suck reflex, which required a prolonged 30-minute feeding period every three hours and the use of the caregiver's fingers to support Baby's face during the feedings. Medical professionals who examined Baby advised that she needed an extensive regimen of services, including a genetic evaluation, physical and occupational therapy, and overall failure-to-thrive monitoring.

The record supports that Mother did not have the mental capacity and stability to adequately respond to Baby's numerous challenges. Mother was observed to be agitated while she was caring for Baby, unaware of what was occurring with Baby physically, and uninterested in interacting with Baby. Also, when Mother became upset about the Agency's suggestion to take Baby for an examination, Mother exhibited aggressive, explosive behavior and the inability to control this behavior to such a degree that police involvement was necessary. The trial court could reasonably conclude that due to Mother's mental health issues and developmental delay, there was a substantial risk that she would be unable to consistently engage in the slow and frequent feeding process that Baby needed, to interact with Baby sufficiently to meet Baby's most basic developmental needs, and to implement whatever therapeutic exercises were recommended for Baby.

The record supports the court's jurisdictional order.

II. *Challenge to Dispositional Findings of Need for Removal and*

*No Reasonable Alternative for Removal*

Challenging the court's dispositional order, Mother argues there was insufficient evidence of a risk of harm to Baby if she were returned to Mother's care with support

14

services in place. Further, she contends the record does not support that the court considered alternatives to removal. She asserts Baby should have been returned to her home under "stringent conditions" to ensure Baby's well-being, including, for example, increased support services from the Regional Center, public health nurses, and independent living services; unannounced visits from a social worker; and imposition of a strict schedule for Mother to feed Baby and with involvement of Grandmother.

Removal of a child from a parent's physical custody is proper if the trial court finds clear and convincing evidence that there is or would be a substantial danger to the health, safety, or well-being of the child and there are no reasonable means of protecting the child without removal. (§ 361, subd. (c)(1).) The court must determine whether reasonable efforts were made to prevent or eliminate the need for removal and must state the facts on which the removal decision is made. (§ 361, subd. (d).) Removal should occur only in "extreme cases of parental abuse or neglect" and the court should consider whether there are "less drastic measures than removal from parental custody." (*In re Basilio T*. (1992) 4 Cal.App.4th 155, 171.)

There is substantial evidence to support that Baby would be at serious risk of harm if returned to Mother's custody and that the court considered less drastic alternatives to removal and reasonably found there were none. As set forth above, the court's decision to remove Baby is supported by Baby's fragile, atrophied, and unresponsive condition; her need for a high level of monitoring and interaction to ensure adequate feeding and physical and mental development; and the limits on Mother's mental capacity that showed she could not provide this degree of care. Although the court's statement of

15

factual findings could have been more explicit, any error was harmless as the court was aware from the Agency's reports that it did not believe Mother's receipt of services and assistance from Grandmother were sufficient to protect Baby, and the court's rulings implicitly reflect that it agreed with this conclusion.  (See *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218 [failure to make required findings does not warrant reversal absent reasonable probability of different outcome].)

Further, the conclusion not to return Baby to Mother is supported by the record. The record shows Grandmother may likewise suffer from developmental delays, and that Baby had reached her deteriorating state notwithstanding Grandmother's presence in the home and the provision of ILS and public health nurse services to Mother.  The court could reasonably assess that although Mother had been provided with a full range of supportive services, these had not prevented Baby's failure-to-thrive condition and, given the level of care now needed by Baby, mere provision of increased services to Mother would not suffice to ameliorate her condition if she was returned to Mother's custody. The record supports that Baby needed ongoing monitoring and attention throughout the day and night, numerous visits to medical professionals, and follow-up care in the home. The court could properly conclude this level of care exceeded the capability of visiting service providers and Mother's capacity to learn and implement caretaking instructions even with Grandmother's assistance, and the only realistic way to protect Baby from serious harm was to place her with a caretaker who would consistently be present to provide and oversee Baby's care.

16

The record supports the trial court's decision to remove Baby from Mother's custody.

As reflected in our above analysis, we are not persuaded by Mother's claim that the court's orders must be reversed because her developmental delay was not shown to be the *cause* of Baby's problems due to the possible genetic component of Baby's condition. Regardless of the extent to which Baby's problems might be caused by a genetic condition, Mother's mental limitations created the risk of serious harm to Baby because Mother did not recognize Baby was not thriving and demonstrated that she lacked the mental capacity and stability to adequately respond to Baby's failing condition and need for a high level of intervention to restore and maintain Baby's health.[3]

### DISPOSITION

The orders are affirmed.

HALLER, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.

---

[3]     The Agency filed a motion to augment the record on appeal to include information that was submitted to the trial court after the orders that are before us in this appeal. We deny this motion.